**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | Case No. 3:22-cr-172 (AWT) |
| v. | |
| | February 9, 2023 |
| RAJHNI YANKANA | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The Government respectfully submits this memorandum in connection with the sentencing of defendant Rajhni Yankana. On August 26, 2022, Mr. Yankana pled guilty to one count of wire fraud, in violation of 18 U.S.C. § 1343, based on his participation in a scheme to defraud the online vendor Amazon.com, Inc. ("Amazon"). He faces a Guidelines range of 15 to 21 months in prison. For the reasons that follow, the Court should impose a sentence at or near the bottom of that range.

### OFFENSE CONDUCT AND PROCEDURAL HISTORY

Between about 2016 and 2018, a loosely connected group of individuals centered in Bridgeport bilked Amazon out of about three million dollars. Operating largely independently, they created bogus Amazon vendor accounts and convinced the company that it had "lost" valuable merchandise they falsely claimed to have shipped to its warehouses. Through his participation in this scheme, Mr. Yankana stole $210,836.97 from Amazon. *See* PSR ¶ 15.

Specifically, Mr. Yankana's scheme worked like this. At all pertinent times, Amazon allowed third-party vendors to use its online platform and physical infrastructure through the Fulfilled by Amazon ("FBA") program. A vendor would create an account by providing such identifying information as a name, email address, and phone number. After doing so, the vendor could add inventory to its account by identifying products it wished to sell (typically, by searching for and selecting the same product on Amazon's website). *See* PSR ¶ 8. The vendor would then

communicate to Amazon that it wished to list a designated quantity of those inventory items on Amazon.com at a given price. Amazon would send the vendor preprinted shipping labels so the vendor could send the merchandise listed for sale to an Amazon Fulfillment Center. *See id.* In turn, the vendor would ship their merchandise, and when the Fulfillment Center received it, it would be added to the vendor's online inventory. The merchandise would be stored at the Fulfillment Center and listed for sale on Amazon.com until a consumer purchased it, at which point Amazon would ship the merchandise to the consumer and the vendor would be paid. *See id.*

Because this system required the vendor to physical ship merchandise to a Fulfillment Center, there was a small risk of loss in any given case. (For example, the package might be mishandled when received at the warehouse.) Accordingly, Amazon's platform allowed vendors to request refunds for shipped products that were never added to inventory. Essentially, within a short period of time after shipment, the vendor could request a refund, then obtain one by proving that it had legitimately owned the lost merchandise. Amazon would send the refund to a bank account designated by the vendor. *See id.*

The group of fraudsters of which Mr. Yankana was a part defrauded Amazon by abusing this system. In many cases, they created vendor accounts linked to false names and other identifiers. *See* PSR ¶¶ 10, 13. They would then add items to their online inventory—generally expensive electronics, such as external hard drives—and receive shipping labels for the designated merchandise. But they would not ship those products to Amazon (often sending empty parcels or worthless items instead). *See* PSR ¶ 9. The designated merchandise would not be added to the vendor's inventory, and in time the vendor would request a refund on the ground that it had been lost. The vendor would often support its claim with doctored invoices (in the form of edited PDF documents) purporting to demonstrate its ownership of the "lost" merchandise. In many cases,

Amazon issued refunds for such items—but in time, it uncovered the scheme, and FBI began to investigate.

That investigation revealed Mr. Yankana's role in the fraud. Between September 2016 and August 2018—often using vendor accounts created with false identifying information—he made dozens of fraudulent refund requests to the company, supporting many of those requests with falsified invoices (many from the electronics website Newegg.com). *See* PSR ¶ 11, 13. In response to his requests, Amazon disbursed a total of $210,836.97 spread across twenty separate payments. Of that figure, about $171,018 went to nine different accounts (at three different banks) in Mr. Yankana's name. *See* PSR ¶ 11. The remaining funds went to accounts held by others but designated by Mr. Yankana to receive Amazon funds (from which much of the money was sent on to Mr. Yankana's accounts): about $16,363 to accounts in the name of his ex-girlfriend and about $23,454 to accounts in the name of another acquaintance. *See id.*; *see also* PSR ¶ 12 (chart showing all payments).

In February 2022, federal agents attempted to confront Mr. Yankana with evidence of his part in the scheme. He retained counsel and, in August, waived indictment and pled guilty to a one-count information charging wire fraud. *See* Dkt. No. 7.

The parties' written plea agreement did not specify a loss amount or Guidelines calculation. The PSR, filed on January 23, accurately calculates the loss at $210,836.97. *See* PSR ¶¶ 12, 21. That, combined with Mr. Yankana's placement in Criminal History Category I, produces a Guidelines range of 15 to 21 months in prison. *See* PSR ¶ 68.

## DISCUSSION

Although the Supreme Court has held that the Guidelines are not mandatory, *see United States v. Booker*, 543 U.S. 220 (2005), it has also held that courts must "consult" the Guidelines and "take them into account" when fashioning a sentence. *Id.* at 264. A district court "should begin all sentencing proceedings by correctly calculating the Guidelines range," and that range is "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After calculating the Guidelines, a court must consider the factors set out at 18 U.S.C. § 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," *id.* § 3553(a)(1); "the need for the sentence imposed" to further the four purposes of sentencing, *id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3); the Guidelines range itself, *id.* § 3553(a)(4); any pertinent policy statement by the Sentencing Commission, *id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7). The statute directs a court, having considered these factors, to impose a sentence "sufficient, but not greater than necessary, to comply with the purposes" of federal criminal sentencing:

(A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)  to afford adequate deterrence to criminal conduct;

(C)  to protect the public from further crimes of the defendant; and

(D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

*Id.* § 3553(a)(2).

District courts may not presume that a Guidelines sentence is appropriate. *Gall*, 552 U.S. at 50. But at the same time, "[t]he fact that § 3553(a) explicitly directs sentencing courts to

consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Id.* at 50 n.6. After all, while the Guidelines are not binding, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita v. United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall*, 552 U.S. at 46.

### A. The § 3533(a) factors justify a significant prison sentence.

Here, with all these considerations in mind, the Court should impose a sentence at or near the bottom of the Guidelines range.

The nature and circumstances of Mr. Yankana's serious offense suggest a level of culpability counseling a meaningful prison sentence. *See* 18 U.S.C. § 3553(a)(1), (a)(2)(A). Start with his entry into the fraudulent scheme. There are many federal fraud defendants whose crimes had their roots in legitimate undertakings that encountered unexpected difficulties, leading the perpetrator to cross into criminality as an intended stopgap born of desperation. In that way a fiduciary can become an embezzler, an investment advisor a Ponzi schemer. Obviously, offenses of that kind are not condoned. But the impulse toward crime can at least be understood.

That is not this case. From the moment Mr. Yankana became involved with the scheme, he had one aim: Take money that belonged to Amazon and make it his own. To do that—again, from the outset—he had to tell lies and, more than that, falsify documents to support his bogus claims. There was never a moment when it could have been anything short of glaringly obvious to him that his conduct was deceptive, wrong, and illegal. Yet he willingly started down that path nonetheless.

Just as bad, Mr. Yankana continued to walk that path for the better part of two years. *See United States v. Bodden*, 552 F. App'x 86, 86-87 (2d Cir. 2014) (74-month sentence justified in part by "the duration of [the defendant's] offense"). He received his first ill-gotten refund from Amazon on September 24, 2016. *See* PSR ¶ 12. He received his last on August 16, 2018. *See id.* In between, he made dozens of fraudulent requests and received, in return, twenty separate payments from Amazon. *See* PSR ¶¶ 11, 12.

In short, his crime was not the product of some momentary lapse. Far from it. Each of those requests to Amazon required investments of time and energy: creating a vendor account, specifying inventory, mailing parcels, doctoring PDF invoices. Every time Mr. Yankana sat down to do those things, it provided him a chance to reflect on and alter his behavior. Rather than do so, he diligently applied himself to the calculated task of defrauding his victim, continuing until he had come away with more than two hundred thousand dollars.

Nor did Mr. Yankana's course of conduct originate in unusually desperate personal circumstances (abject poverty, drug addiction, the like). Instead, he embarked on this scheme because he found himself in circumstances familiar to many of our state's citizens: He "was working low-paying jobs that he disliked." Deft's Sent. Mem. 16, Dkt. No. 24. His get-rich-quick solution was to steal hundreds of thousands of dollars from Amazon, then invest it along lines recommended by some dubious internet personality who professed to his acolytes that "working a 9-5 job isn't the right way to live life to the fullest." *Id.* at 18; *see id.* at 16-18. (Predictably, he lost most of the money. PSR ¶ 15.) In short, Mr. Yankana's motive was both simple and eminently blameworthy. He just wanted money.

Shifting focus from Mr. Yankana to the broader set of would-be offenders, this case calls for a substantial prison term in the interest of general deterrence. *See* 18 U.S.C. § 3553(a)(2)(B).

To be sure, this sentencing factor has its doubters, skeptical of the notion that potential criminals rationally weigh costs associated with possible punishment. But when it comes to general deterrence, not all crimes are created equal, and "[t]he need for general deterrence is particularly acute in the context of white-collar crime." *United States v. Johnson*, No. 16-cr-457 (NGG), 2018 WL 1997975, at *5 (E.D.N.Y. Apr. 27, 2018). "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013) (internal quotation marks omitted). "Persons who commit white-collar crimes like defendant's are capable of calculating the costs and benefits of their illegal activities relative to the severity of the punishments that may be imposed." *United States v. Stein*, No. 09-cr-377, 2010 WL 678122, at *3 (E.D.N.Y. Feb. 25, 2010). Accordingly, "[a] serious sentence is required to discourage such crimes." *Id.*

Those considerations are particularly apt here. As explained, Mr. Yankana's offense conduct persisted over a two-year period, during which he engaged in hundreds of independent actions oriented toward defrauding his victim. A moment's rational thought at any point in that time—inspired, perhaps, by the knowledge that getting caught would likely produce a hefty prison sentence—may have caused him to stay his hand.

In addition, putative offenders in Mr. Yankana's position—*i.e.*, considering defrauding a large corporate entity through remote means—may be in special need of deterrence. Stealing from Amazon by creating bogus vendor accounts is not like stealing from a person by snatching her purse. Amazon is a legal entity, not a personal one. It is far-off, faceless. It is deep-pocketed. A would-be fraudster may be able to convince himself that ripping off a company like Amazon is somehow less real than other forms of theft, or that, given the victim's means, the crime is unlikely

to be noticed or the money much missed. A significant sentence in a case like this would send a message that fraud of this kind is just that—fraud, and punished accordingly.

> **B. Mr. Yankana's arguments in mitigation do not justify the non-carceral sentence he seeks.**

Mr. Yankana offers a number of arguments in mitigation. Of course, the Court can and should consider them in selecting a sentence. But they do not justify the well-below-Guidelines sentence he seeks.

First, Mr. Yankana emphasizes his age at the time of his offense—he was 21 when he started, 23 when he finished. *See* Deft's Sent. Mem. 7-9. He stresses, particularly, that development of the prefrontal cortex—responsible for impulse control, executive function, and decisionmaking—continues to develop until age 25 on average. *See id.* at 7. Accordingly, he argues, his crime should be viewed as the product of immature judgment. *See id.* at 8.

It is certainly true, as a general matter, that youth may bear on sentencing. But Mr. Yankana's argument would be more convincing if his crime had indeed owed merely to poor "impulse control," *id.* at 7, or "impetuous . . . conduct," *id.* at 9 (internal quotation marks omitted). Instead, it was a years-long, calculated course of behavior that required significant planning, organization, and attention to multiple tasks (*e.g.*, setting up false e-mail and vendor accounts, doctoring invoices, and submitting refund requests)—all aspects of executive function governed by his prefrontal cortex. Perhaps, in deciding initially to become involved in defrauding Amazon, Mr. Yankana made an impulsive choice that he would not have made years later. But he then carried out the scheme very much in the manner of a functioning adult, and his punishment should reflect as much.

Mr. Yankana also focuses on his lack of any prior criminal history. *See* Deft's Sent. Mem. 23. This, too, would carry more weight if his crime had been a single act (or even a relatively short

series of acts). It was not. He pled guilty to one fraud scheme, but that scheme embraced dozens of independently criminal acts over the course of multiple years—a pattern of wrongdoing detracting from the force of the argument that he has offended just once.

Mr. Yankana also invokes the prospect that he will be removed from the United States as a result of his crime, which, he says, bears on the Court's sentencing determination along multiple dimensions: he may ultimately suffer removal and in any case will endure uncertainty about its possibility, and, should he be subject to an immigration detainer, it could affect his eligibility for certain programs in prison. *See* Deft's Sent. Mem. 20-21. While the Court may consider these factors, *see United States v. Thavaraja*, 740 F.3d 253, 262-63 (2d Cir. 2014), they should not weigh heavily in its calculus. First, it is not clear whether Mr. Yankana will be removed or made subject to an immigration detainer. The Court should not significantly modify an otherwise appropriate prison sentence based on speculation that he will be. Second, it is probably true that, whether he is removed or not, Mr. Yankana will have to (for some period of time, anyway) live with uncertainty in this regard. But the fact that he will experience some measure of anxiety about his status—occasioned by his decision to commit a serious federal felony as a non-citizen—is not by any stretch so substantial a consequence as to outweigh the features of his case calling for a meaningful prison term.

Finally, Mr. Yankana points to his progress since the end of his scheme, including that he recently became a father and is working diligently to support his family. This is, of course, a factor the Court should consider in fashioning a sentence. Mr. Yankana's positive development is to his credit and, from the government's perspective, meaningfully diminishes concerns that he will reprise his criminal behavior in the future. But in light of all the considerations set forth in this

memorandum, the government is unable to conclude that this consideration—even in combination with Mr. Yankana's other mitigating arguments—justifies the dramatic variance he seeks.

## CONCLUSION

For the reasons given, the government respectfully requests that the Court impose a sentence at or near the bottom of the Guidelines range.

Respectfully submitted,

VANESSA ROBERTS AVERY
UNITED STATES ATTORNEY

/s/ Conor M. Reardon
CONOR M. REARDON
ASSISTANT U.S. ATTORNEY
Federal Bar No. phv10431
157 Church Street, 25th Floor
New Haven, CT 06510
Tel.:    (203) 821-3700
Email: conor.reardon@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on February 9, 2023, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF system.

<u>/s/ Conor M. Reardon</u>
Conor M. Reardon
ASSISTANT U.S. ATTORNEY
Fed Bar No. phv10431
157 Church Street, 25th Floor
New Haven, CT 06510
Tel: (203) 821-3700
Fax: (203) 773-5378
conor.reardon@usdoj.gov